FILED

2011 Sep-12  PM 04:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| STEVEN D. THOMAS | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO. CV 11-J-0830-NE |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter is before the court on the record. This court has jurisdiction pursuant to 42 U.S.C. § 405. The plaintiff is seeking reversal or remand of a final decision of the Commissioner. All administrative remedies have been exhausted.

### Procedural Background

The plaintiff applied for Supplemental Security Income on September 28, 2007, alleging an inability to work since October 1, 2006 (R. 98-104). Plaintiff alleges disability due to discogenic and degenerative disorders of the back and associated pain in the lower back, neck and shoulders (R. 64, 130). The administrative law judge (ALJ) reached a determination that plaintiff was not disabled at any time through the date of his decision, October 23, 2009 (R. 14-23). The Appeals Council denied his request for review on January 7, 2011 (R. 1-3). The ALJ's decision thus became the

1

final order of the Commissioner. *See* 42 U.S.C. § 405(g). This action for judicial review of the agency action followed (doc. 1). The court has considered the entire record and whether the decision of the ALJ is supported by substantial evidence. For the reasons set forth below, the decision of the Commissioner is due to be **REVERSED**.

### Factual Background

The plaintiff is a 51-year-old male, born February 18, 1960, with a ninth-grade education (R. 37). Plaintiff describes his most recent job as "detail work. They would have me take new cars and prepare them for the lot." (R. 38-39). Plaintiff lost that job because "[he] couldn't quite hold down a job with all the stuff they required [him] to do." (R. 38-39). Prior to this job, plaintiff was, for two brief stints, a "painter helper" and a "car washer" (R. 120-122). Plaintiff has not attempted to find work since losing his most recent job in 2007 (R. 52). Plaintiff lives with his mother at her house with his sixteen-year-old son and, sometimes, his five-year-old son  (R. 44, 129).

In his application, plaintiff claims disability from October 1, 2006 (R. 98). However, at his hearing before the Administrative Law Judge (ALJ), he amended it to reflect that his disability began on September 28, 2007 (R. 37).  Plaintiff claims his actual medical problems started when he "was helping a guy doing some painting work and I actually fell off a ladder and hit on my, on my leg and it just jarred my

back real bad. And, and ever since then it's actually where [the pain] started . . . on my back." (R. 39). Though the plaintiff claims disability beginning in 2007, records from his visits to various physicians indicate that his back and neck pain existed as early as 2004 (R. 181-90).[1]

In August 2006, the plaintiff was diagnosed with degenerative disk disorder (R. 235).[2] On that occasion, plaintiff also complained of shoulder pain, and an MRI showed "[m]oderate osteoarthritis of the AC joint with some encroachment on the anterior aspect of the musculotendinous junction of the supraspinatus" as well as a 1.9 centimeter "paralabel cyst in the infraglenoid region with what appears to represent an infraglenoid labral tear" (R. 236).

---

[1]No exact date is provided in the record; the plaintiff testified before the ALJ that the injury "would have been like in '02" (R. 39). Plaintiff also claims injuries resulting from a criminal assault/robbery that occurred in late 2001 (R. 40, 51). The plaintiff was returning from his girlfriend's house in the middle of the night when he was accosted by a man he did not know (R. 40). The plaintiff claims "I stuck my hand out to shake hands and he just snatched me forward and he had a steel pipe behind his back. And he hit me first right in the face and just, I mean I couldn't see nothing but blood. . . . [B]oth my eyes filled up with blood and he just kept beating me and hitting me in the back of the head and side of the head." *Id.* Plaintiff's emergency room records confirm his account of his injuries; plaintiff received stitches to close numerous lacerations on his head and face (R. 283-87, 290-91). However, it does not appear from the other evidence in the record that plaintiff continues to suffer from any permanent or residual injury as a result of the attack.

[2]Specifically, the plaintiff's diagnosis includes "[m]ild to moderately severe discogenic degenerative change . . . present at essentially all lumbar disc levels" and "[m]oderately severe discogenic degenerative change at L4-5 with anterior spur disc protrusion showing mild anterior mass effect on the thecal sac, . . . [with] significant focal spur disc encroachment on the left L4-5 neural foramen as well as some adjacent facet encroachment resulting in moderately severe left L4-5 neural foraminal narrowing" (R. 235).

On October 6, 2006, plaintiff underwent anterior cervical diskectomy with decompression of spinal cord and nerve roots and foraminotomies on C4-5, C5-6, and C6-7; anterior cervical fusion and placement of interbody spacer device on C4-5, C5-6, and C6-7; and plating on C4-5 and C6-7 (R. 204-05). At plaintiff's post-operative follow-up appointment on October 18, 2006, Dr. Thomas Cordover, the plaintiff's treating physician, commented that plaintiff was "[d]oing great" after his surgery, and healing well, though Dr. Cordover did note that he was "concerned about residual long-term disability with [the plaintiff's neck] and his back." (R. 209). However, on November 21, 2006, the medical records reflect that plaintiff had increased pain and that his pain control was not adequate (R. 224).

Pain persisted many months beyond the surgery. Plaintiff had "a crick in [his] neck three or four times a month and it would last two or three days at a time." (R. 41). He tried various over-the-counter remedies, and claims that the "only thing" that helped was a neck brace, which he described as a "hard collar" that he wore and slept in at night (R. 41-42, 62). Plaintiff returned to his doctor on May 23, 2007, for a "recheck" and Dr. Cordover observed that plaintiff was "let go by his pain specialist" (R. 208). He reported "2 months of some worsening neck symptoms going down left arm," as well as pain in the left leg and lower back which Dr. Cordover noted were "chronic" (R. 208, 218). Dr. Cordover expressed "concern" and believed obtaining

4

an MRI would be "reasonable." However, plaintiff wished to try a Medrol Dosepak to see if it would resolve the symptoms. *Id.* Dr. Cordover indicated that if the Medrol Dosepak was not successful, an MRI should be obtained and that subsequent care would be advisable based on those results. *Id.*

In his physical activity questionnaire filled out in October 2007, plaintiff stated "I usuly [sic] hurt so bad I don't fell [sic] like doing any activities," (R. 129) and said that his family members usually performed household chores for him because his pain prevented him from doing so (R. 130). He also claimed he could not pick up even small bags of groceries or drive a car for very long (R. 132).

An examination by a consulting physician in December 2007 supports plaintiff's complaints and pain history (R. 240-44). Dr. Charles Carnel, the consulting physician, reported that plaintiff limped slightly with antalgic to the left gait, favored the right side when squatting, had decreased lateral cervical rotation to both sides, and had decreased lumbar extension and flexion (R. 241-42). Dr. Carnel also reported that plaintiff was "tender" to palpation in the lower back, shoulders, upper spine and pelvis, and observed that plaintiff "has a relatively thin body habitus" and that he "demonstrates pain with cervical and lumbar range of motion" (R. 243). He diagnosed plaintiff with "[c]ervical stenosis and radiculopathy/myelopathy status post ACDF, likely residual mechanical cervical neck pain and myofascial pain, . . . [m]echanical

lumbar spine pain, likely left sacroiliac joint dysfunction," and wrote that he "[c]annot rule out facet arthropathy/hypertrophy" (R. 243-44).

In May 2008, plaintiff was again referred to a pain management specialist to help manage his chronic pain, which the referring physician, Dr. Greg Sullivan, described as "severe at times" (R. 271).

Plaintiff currently takes Methadone, as prescribed by his physician, to manage his pain symptoms, and numerous over-the-counter medications daily, including Aleve, Advil, and extra-strength Tylenol (R. 43, 253-77). His prescribed medication "kind of numbs [the pain] a little bit" but he says that the pain is persistent and never goes away completely (R. 43). Plaintiff claims that when he "lays down for a little while . . . it seems to help somewhat" (R. 43). At various points over the past several years, plaintiff has taken Lortab consistently for pain (R. 182), at times asking that the dosage be increased because the pain is so severe (R. 228). As to the severity of his pain, plaintiff alleges it is a "four or five" while on his pain medication, and that without the medication, it is "excruciating . . . a nine or a ten" out of ten (R. 54).

None of plaintiff's treating or consulting physicians have ever indicated that plaintiff is either a drug addict or a malingerer. As recently as May 2008, Dr. Sullivan observed that plaintiff had no significant drug history (R. 271). Doctors have, at various times and for many years, prescribed plaintiff Lortab and Methadone to

manage his pain (R. 253-77). The pain is described in the medical records as "chronic" (R. 270). Plaintiff has taken 10 mg of Methadone five times per day since at least 2006 (R. 163). By plaintiff's own admission, he has in the past had some dependency on Lortab, due to his continued use of that drug at the recommendation and prescription of his doctors (R. 45, 49-50). Prior to plaintiff's surgery in October of 2006, plaintiff's physician expressed concern over plaintiff's "opiod dependence and perhaps even addiction" (R. 231); however, plaintiff appeared willing to endeavor not to be dependent on prescription medications. During the same pre-surgery assessment, plaintiff signed a narcotics contract, agreed with the physician's plan that involved obtaining a neuropsychologic evaluation to determine plaintiff's addiction potential, and understood that if the workup was negative for abnormalities that justify the use of narcotics, the physician would be unable to write plaintiff prescriptions for narcotics in the future. *Id.* Moreover, at his hearing before the ALJ, plaintiff testified that he does not want to "get dependent on a bunch of kind of medicines" (R. 50). Plaintiff  takes his pain medicine because it makes the pain "bearable" (R. 50).

At the hearing, the ALJ proposed three hypothetical situations involving plaintiff's relative ability to work to the Vocational Expert ("VE") and asked for his opinion with respect to each. On the first hypothetical, the VE testified that if, as

7

indicated by his Physical Residual Functional Capacity Assessment, plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour work day, push or pull objects without limitation, occasionally climbs ramps or stairs, never climb ladders, rope or scaffolds, avoid concentrated exposure to extreme cold and hazardous machinery (R. 245-52), and if plaintiff's pain were at a mild to moderate level, plaintiff would not be able to perform "medium work," but plaintiff could perform a range of "light work" jobs in the national economy such as fast food worker, laundry sorter/worker, and line assembly worker (R. 57-58). The ALJ then altered the original hypothetical by reducing plaintiff's ability to stand from six to four hours in an eight hour workday, adding "a sit/stand option requirement," and eliminating plaintiff's ability to reach overhead  (R. 58). The VE testified that plaintiff would not be able to return to his prior work, but that plaintiff would still be able to perform certain jobs such as automatic machine tender in the plastics industry or assembly line sorter (R. 59). Finally, when asked by the ALJ whether plaintiff could work given the same circumstances as in the second hypothetical, except that plaintiff's pain level was "moderately severe" and plaintiff was taking narcotic pain medication, the VE replied that plaintiff would not "be able to perform past work or other work" (R. 59).

Plaintiff testified before the ALJ that "every now and then [he] might do a little grass cutting job or . . . paint a bedroom or something" (R. 41), but also said that while he will "try to help pick up a little bit around the house," he "can't move stuff or . . . do stuff for a long period of time" without having to sit or "get somewhere to stretch" (R. 46). He says he can take out the trash, provided "it's just a little small kitchen can," and that he can make the bed, but claims it is difficult and he must stop to rest (R. 50). He claims he has difficulty getting dressed, specifically putting on his pants and tying his shoes, and that he must sit down on a stool in the shower in order to properly bathe his feet (R. 51). He also testified that his disability prevents him from engaging in physical activity with his young son (R. 44-45). Plaintiff does not own a car and "very seldom" drives (R. 47).

Plaintiff testified that he needs additional surgery on his lower back, but that he cannot afford such surgery at present because he does not have insurance (R. 36, 42-43). He asserts that he would have this surgery if he had the means (R. 43).

Plaintiff's complaints of pain are supported by the medical records reflecting increased pain with activity (R. 261) and steadily increasing prescribed dosages of Methadone (R. 273-77).

## Standard of Review

In a Social Security case, the initial burden of establishing disability is on the

9

claimant, who must prove that due to a mental or physical impairment he is unable to perform his previous work. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). If the claimant is successful, the burden shifts to the Commissioner to prove that the claimant can perform some other type of work existing in the national economy. *Id.*

This court's review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence" is generally defined as "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

This court also must be satisfied that the decision of the Commissioner is grounded in the proper application of the appropriate legal standards. *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988); *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987); *Davis v. Shalala*, 985 F.2d 528 (11th Cir. 1993). No presumption of correctness applies to the Commissioner's conclusions of law, including the determination of the proper standard to be applied in reviewing claims. *Brown v.*

10

*Sullivan*, 92 F.2d 1233, 1235 (11ᵗʰ Cir. 1991); *Corneliuis v. Sullivan*, 936 F.2d 1143, 1145 (11ᵗʰ Cir. 1991). Furthermore, the Commissioner's "failure to . . . provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius*, 936 F.2d at 1145-46.

When making a disability determination, the ALJ must consider the combined effects of all impairments. *Davis*, 985 F.2d at 534; *Swindle v. Sullivan*, 914 F.2d 222, 226 (11ᵗʰ Cir. 1990); *Walker*, 826 F.2d at 1001. When more than one impairment exists, the plaintiff may be found to be disabled even though none of the impairments considered alone would be disabling. *Walker*, 826 F.2d at 1001. The ALJ must evaluate the combination of impairments with respect to the effect they have on the plaintiff's ability to perform the duties of work for which he or she is otherwise capable. *Lucas v. Sullivan*, 918 F.2d 1567, 1574 (11ᵗʰ Cir. 1990). Merely reciting that the plaintiff's impairments in combination are not disabling is not enough. The ALJ is required to make specific and well-articulated findings as to the effect of the combination of impairments. *Walker*, 826 F.2d at 1001.

### Legal Analysis

In this case, the ALJ found that plaintiff has the severe impairments of an anterior cervical discectomy and fusion (ACDF) and degenerative disc disease, and further suffers from hypertension, which is a non-severe impairment (R. 16).

11

Regardless, the ALJ denied the plaintiff benefits, finding that plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the above residual capacity assessment" (R. 18). The ALJ further found plaintiff's "statements about symptoms and functional limitations are only partially credible as the severity alleged is not consistent with the objective findings from the evidence in the file" (R. 20).

The ALJ attributes plaintiff's lack of credibility with respect to his pain to his "addiction." Specifically, the ALJ refers to plaintiff's July 21, 2006, admission to Dr. Purdy that he took Lortab more "for addiction instead of pain"(R. 230), which the ALJ posits "suggests that the claimant may have exaggerated his pain levels in order to obtain prescriptions for narcotics" (R. 21-22). This is the *only* evidence of "addiction" upon which the ALJ bases his conclusion. The ALJ describes this "addiction" to narcotics as "consistently noted in his medical record" (R. 21). However, the statement upon which the ALJ relies was made prior to plaintiff's surgery, prior to his claim that his disability began, and certainly prior to his many subsequent prescriptions for Methadone, to which no doctor has stated plaintiff is addicted. The ALJ fails to metion that Dr. Sullivan explicitly found in May of 2008 that plaintiff has "no significant drug history" (R. 271). Moreover, the ALJ also conveniently omitted from his discussion of Dr. Purdy's assessment the portion of the

record where Dr. Purdy recounts that plaintiff signed a narcotics contract, agreed with a plan that involved obtaining a neuropsychologic evaluation to determine plaintiff's addiction potential, and understood that if the workup was negative for abnormalities that justify the use of narcotics, Dr. Purdy would be unable to write the plaintiff prescriptions for narcotics in the future (R. 231).

The ALJ's findings are simply not supported by substantial evidence. Indeed, the ALJ appears to have selectively considered the evidence in reaching his conclusions. The ALJ's principal support for his assertion that plaintiff's statements regarding his pain are "inconsistent" appears to stem from a comparison of statements made by plaintiff during his first follow-up visit to Dr. Cordover after his surgery, on October 18, 2006, when plaintiff stated that his pain had subsided and that his general condition was much improved, and his statements made during subsequent visits to Dr. Cordover and other physicians, when he indicated that his pain had returned to substantially the same levels as before the surgery (R. 21). The ALJ contends that while plaintiff's surgery "suggests that the symptoms were genuine," such fact, which "would normally weigh in the claimant's favor, . . . is offset by the fact that the record reflects that the surgery was generally successful in relieving the symptoms" (R. 20-21). In support of this conclusion, he references Dr. Cordover's observation that plaintiff was "doing great" following the surgery (R. 21). The ALJ also opined that

13

plaintiff "described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations" (R. 20). However, minimal daily activities do not render one capable of performing work. *See Venette v. Apfel*, 14 F. Supp. 2d 1307, 1314 (S.D. Fla. 1998) (citing *Walker v. Heckler*, 826 F.2d 996 (11th Cir. 1987)). The ALJ apparently failed to take into consideration that Dr. Cordover, after plaintiff's surgery, was concerned about plaintiff's "residual long-term disability" with regard to the areas upon which he operated (R. 209).

The ALJ also contends that at his hearing, plaintiff testified that the Methadone "provided only minimal relief, which is inconsistent with the rest of his hearing testimony and his medical record as a whole" (R. 21). This is simply a mistaken reading of plaintiff's medical record. The ALJ appears to adopt this reasoning based on plaintiff's testimony that the Methadone took his pain from a level plaintiff described as "excruciating" to a more "manageable" 4-5 on a 1-10 scale (R. 54). He thus concludes that plaintiff has "not experienced more than mild to moderate pain" and that his pain is "manageable and well controlled with the drugs prescribed" (R. 22). Review of plaintiff's medical records demonstrates that this conclusion is simply incorrect. The ALJ's determination that plaintiff could perform a limited range of "light work" (R. 23) in support of his conclusion that plaintiff is not disabled is

14

misguided. The ALJ's conclusions are inapplicable because the medical records indicate that plaintiff's pain is not "mild to moderate," as the ALJ asserts, but "moderate to severe" and chronic, which the VE testified would render plaintiff unable to work (R. 59). As the Eleventh Circuit has plainly established, "pain alone can be disabling, even when its existence is unsupported by objective evidence." *Walker*, 826 F.2d at 1003.

By inferring that plaintiff was able to work from his selective review of the evidence, the ALJ substituted his opinion for that of the medical report he determined merited controlling weight.[3] "As the hearing officer, [the ALJ] may not arbitrarily substitute his own hunch or intuition for that of a medical professional." *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1992). The ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983). The ALJ is required, however, to state with particularity the weight he gives to different medical opinions and the reasons why. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).

> Absent "good cause," an ALJ is to give the medical opinions of treating physicians "substantial or considerable weight." *Lewis*, 125 F.2d at 1440; *see also* 20 C.F.R. §§ 404.1527(d)(1)-(2). Good cause exists "when the: (1) treating physician's opinion was not bolstered by

---

[3]One particularly egregious example of this occurred when the ALJ faulted the plaintiff for not wearing his neck collar as prescribed by Dr. Cordover, but then noted that plaintiff sometimes wears a neck brace even though he was never prescribed one (R. 21).

evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips*, 357 F.2d at 1241. With good cause, an ALJ may disregard a treating physician's opinion, but he "must clearly articulate [the] reasons" for doing so. *Id.* at 1240-41.

*Winschel v. Comm'r of Soc. Security*, 631 F.3d 1176, 1179 (11th Cir. 2001). In short, "good cause" exists if the opinion is wholly conclusory, unsupported by the objective medical evidence in the record, inconsistent within itself, or appears to be based primarily on the patient's subjective complaints. *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *see also Crawford v. Comm'r of Soc. Security*, 363 F.3d 1155, 1159-60 (11th Cir. 2004); *Lewis*, 125 F.3d at 1440.

The ALJ here did not have good cause for disregarding the treating physicians' opinions. No medical evidence contradicts plaintiff's physicians' conclusions, and none of them opined that plaintiff was malingering. Rather, the medical records demonstrate that each of plaintiff's treating physicians took his complaints seriously and have tried various treatments for plaintiff's symptoms.  They have had only moderate success in reducing plaintiff's level of pain. The court finds the record devoid of substantial evidence to support the decision of the ALJ. Rather, the ALJ seemed to rely on his own opinion of what a disabled person should act like and then denied benefits to the plaintiff based on this preconceived profile and his mistaken belief, unsupported by evidence, that plaintiff's statements are not credible because

plaintiff is a drug addict.

The court finds the record devoid of substantial evidence to support the decision of the ALJ. The Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991). Here, multiple medical opinions concerning the nature, origins, and severity of plaintiff's pain are before the court. By inferring that plaintiff was able to work from his selective review of the evidence, the ALJ substituted his opinion for that of all of the medical reports in the file, which taken together establish that plaintiff is indeed disabled.

### Conclusion

Based on the foregoing, the court is of the opinion that the decision by the ALJ was not supported by substantial evidence, and therefore the decision of the Commissioner must be **REVERSED** and this case **REMANDED** for the calculation of benefits to which plaintiff is entitled.

**DONE** and **ORDERED** the 12th day of September, 2011.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE